UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| CONSUMERS COUNCIL OF MISSOURI, | |
| Plaintiff, | |
| v. | |
| | Civil Action No.____ |
| DEPARTMENT OF HEALTH AND HUMAN SERVICES, | |
| Defendant. | |

**COMPLAINT AND PRAYER FOR DECLARATORY AND INJUNCTIVE RELIEF**

**INTRODUCTION**

1. This is an  action under the Freedom of Information Act (FOIA), 5 U.S.C. §552, to petition the Court  to order the Department of Health and Human Services (HHS) to produce records responsive to a FOIA request for documents which HHS is required to make public by the Affordable Care Act (ACA), 42 U.S.C. § 300gg-94(a)(2).

**JURISDICTION**

2. This Court has jurisdiction over this action under 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. §1331.

**PARTIES**

3. Plaintiff Consumers Council of Missouri is a non-profit public interest organization in St. Louis, Missouri.  It was established in 1971 to educate and disseminate information to Missouri citizens in the areas of energy, insurance, and finance.  Consumers Council of Missouri works to promote transparency in these areas.

4. Defendant HHS is an agency of the United States government and has possession and control over the records the Plaintiff seeks.

## STATEMENT OF FACTS

5. On August 20, 2014, Plaintiff submitted a FOIA request by letter to the FOIA Director for the Centers for Medicare & Medicaid Services (CMS), the HHS component responsible for implementing the ACA's insurance reforms.  Plaintiff requested (1) the identities of the issuers filing rates for Missouri to take effect in 2015, (2) the rates those issuers propose to charge in 2015, (3) any information contained in Parts I and III of the Rate Filing Justifications the issuers have filed with HHS that they have not designated as trade secret, and (4) any Part II's of such Justifications that the issuers have filed with HHS.

6. The open enrollment period for coverage effective in 2015 begins on November15, 2014 and ends on February 15, 2014.  An HHS regulation requires CMS to establish a mechanism enabling the public to comment on proposed rates.  45 C.F.R. §154.215(h)(4). Plaintiff, as well as the public at large, must have the information requested by Plaintiff before open enrollment for 2015 begins in order to meaningfully comment on the proposed rates.  Due to the urgency and the significant public need for the requested records, Plaintiff sought expedited treatment and a fee waiver in its FOIA request.

7. On September 2, 2014, the CMS FOIA Director sent Plaintiff a form letter acknowledging receipt of Plaintiff's FOIA request.  The letter did not address Plaintiff's request for expedited treatment or a fee waiver.  The letter provided a FOIA tracking request number. The FOIA tracking information states that the request was received by the agency on August 26, 2014.

2

8. Prior to Plaintiff's actions above, ten national consumer organizations, 56 state consumer organizations, and eight National Association of Insurance Commissioners' Consumer Representatives petitioned CMS to make rate filings public as required by the ACA in a letter dated April 23, 2014.   On July 22, 2014 CMS responded to the organizations--thanking them for recognizing the importance of making public the rate filing information but refusing to fulfill the actual request or otherwise comply with its own regulation.

9. To date, Defendant HHS has not provided the records requested by Plaintiff in its FOIA request, notwithstanding its obligation to respond within twenty working days under the FOIA, 5 U.S.C. § 552(a)(6)(A)(ii).

10. As Defendant has failed to meet the statutory timelines, Plaintiff is deemed to have exhausted its administrative remedies pursuant to 5 U.S.C. § 552(a)(6)(C).

### HHS's Failure to Disclose Rate Filing Information to the Public

11. The ACA requires the Secretary of HHS "to, in conjunction with the states, establish a process for the annual review, beginning in the 2010 plan year…of unreasonable increases in premiums," and to "ensure the public disclosure of information on such increases and justifications for all health insurance issuers." 42 U.S.C. § 300gg-94(a) (section 2974 of the ACA).

12. HHS promulgated a rule implementing section 2974 of the ACA on May 23, 2011. 76 Fed. Reg. 29964, 29945 (codified at 45 C.F.R. § 154.215).  HHS promulgated a revised rule on February 27, 2013. 78 Fed Reg. 13405, 13440 (hereinafter "Rate Review Rule").

13. In states that HHS has found to have an Effective Rate Review Program as defined in HHS's Rate Review Rule, the state Insurance Department reviews proposed increases of 10% or more.  In states that HHS has found not to have an Effective Rate Review Program, CMS

3

reviews such increases.  HHS has found that Missouri does not have an Effective Rate Review Program, and therefore CMS reviews proposed health insurance rates in Missouri, in both the individual and small group market.

14. The Rate Filing Justification for their proposed 2015 rates that Missouri health insurers must file with CMS must contain three parts: Part I, the unified rate review template, which among other things includes historical and projected claims experience; Part II, which is a written description justifying the rate increase; and Part III, which includes an actuarial memorandum explaining the assumptions and reasoning which support the data in Parts I and II. 45 C.F.R. § 154.215(d); 45 C.F.R. § 154.215(e); 45 C.F.R. § 154.215(f).

15. The HHS Rate Review Rule requires insurers to file Part I and Part III of the Rate Filing Justification for proposed increases of any amount, and requires the filing of Part II as well for proposed increases of 10% or more.  45 C.F.R. sec. 154.215(c).

16. The HHS Rate Review Rule requires CMS to promptly make available Part II of the Rate Filing Justification, and to make available the information contained in Parts I and III which is not trade secret or confidential.  45 C.F.R. § 154.215(h).

17. The HHS Rate Review Rule also requires CMS to provide a mechanism for the public to submit comments on proposed rate increases that CMS reviews.  45 C.F.R. §154.215(h)(4). In order for the public to comment on *proposed* rate increases, HHS must necessarily release this information before the rates go into effect.

18. CMS has stated and continues to state on its website that the Rate Filing Justifications are available on its website. CMS, Rate Review Data, Sept. 2, 2014, archived webpage https://web.archive.org/web/20140902184956/http://www.cms.gov/CCIIO/Resources/Data-Resources/ratereview.html (last accessed Sept. 30, 2104), attached as Exh.1; CMS, Rate Review

Data, Sept. 29, 2014, http://www.cms.gov/CCIIO/Resources/Data-Resources/ratereview.html (last accessed Sept. 29, 2014), attached as Exh. 2.  In fact, however, CMS has not made public any part of such justifications for 2015 rates, did not make public any part of such justifications for rates for previous years before such rates were implemented, and even today does not make public Rate Filing Justifications for previous years as its own regulation requires.

19. The CMS website currently also contains a link to a page that the website characterizes as "contain[ing] a search tool to find non-single risk pool compliant Part III Preliminary Justification Documentation by State and issuer."  In fact, however, that page contains documentation for insurers in only 13 states, and contains no documentation of any kind for any rate becoming effective after July 2013.  CMS, Rate Filing Documentation (Part III) http://www.cms.gov/apps/rrjsearch/search.aspx (last accessed on Sept. 29, 2014), attached as Exh. 3.

20. In addition, HHS states in its Rate Review Annual Report issued September 2014 that "[t]he rate review provisions of the Affordable Care Act enhance transparency in the health insurance market and hold insurance companies accountable for rate increases.  Rate changes are now public information, and issuers must provide data on requested increases of any size." HHS, Rate Review Annual Report, 7, Sept. 2014, available at http://aspe.hhs.gov/health/reports/2014/RateReview/rpt_RateReview.pdf, attached as Exh. 4. HHS is both proclaiming and celebrating that the rate review provisions are being implemented as required by law.  In actuality, HHS is not implementing the law as required and is not making rate filing information public.

21. Despite the mandates of 42 U.S.C. § 300gg-94(a) and 45 C.F.R. § 154.215, despite its own representations that it is complying with those mandates, and despite the impossibility of

commenting on undisclosed rates and undisclosed Rate Filing Justifications, CMS has made no

information public for any plans that will be sold on the Exchanges in 2015.  CMS has also

failed during the last three years to make public any Rate Filing Justifications before rates have

gone into effect, and even today does not make public for previous years the Rate Filing

Justification information its own regulation requires it to.

### The Impact of HHS's Failure to Disclose Rate Filing Data on Plaintiff and Other Missouri Citizens

22. Missouri does not require insurers to file any documentation with the state or make

any information available to the public regarding proposed rates.  Therefore, Missouri citizens

are entirely dependent on HHS for information regarding the identities of issuers filing rates in

Missouri, the rates they seek to charge, and the justification for those rates.

23. Plaintiff's FOIA request seeks information which cannot be withheld under any FOIA

exemptions.

24. Plaintiff has a statutory right to the records it seeks, and HHS has no legal basis for

failing to disclose those records to Plaintiff.

### PRAYER FOR RELIEF

Wherefore, Plaintiff requests that this Court:

(1) Declare that Defendant's withholding of the requested records is unlawful;

(2) Order Defendant to make the requested records available to the Plaintiff immediately;

(3) Order that Defendant grant Plaintiff's fee waiver request;

(4) Award Plaintiff its costs and reasonable attorneys' fees; and

(5) Grant any other relief this Court deems just and proper.

Respectfully submitted,

/s/Jay Angoff
Jay Angoff (Mo. Bar No. 46415)
Mehri & Skalet, PLLC
1250 Connecticut Ave., NW, Suite 300
Washington, D.C. 20036
Telephone: 202-822-5100

# Exhibit 1

Case: 4:14-cv-01682-JCH   Doc. #: 1   Filed: 09/30/14   Page: 9 of 23 PageID #: 9



http://www.cms.gov/CCIIO/Resources/Data-Resources/ratereview.html    Go

92 captures

23 May 13 - 17 Sep 14

JUL  SEP  OCT  Close
  
2013  **2**  2015    Help
         2014



Centers for Medicare & Medicaid Services

CCIIO Home  >  Data Resources  >  Rate Review Data

# The Center for Consumer Information & Insurance Oversight

## Rate Review Data

### Background

As of September 1, 2011, the Affordable Care Act and rate review regulation require review of rate increases of 10 percent or more.  A non-grandfathered health plan sold in the individual or small group market that increases its rates by 10 percent or more is subject to review to determine whether the increase is unreasonable. Most states and territories have an effective rate review program  and will review rate increases submitted by health insurance issuers in their states and territories.  CMS will review rate increases in the market(s) where states do not have an effective rate review program.

For each rate increase subject to review, a health insurance issuer must submit a Preliminary Justification for each product affected by the increase.  This Preliminary Justification consists of the following parts:

> **Part I, Rate Increase Summary:** A form that summarizes the data used to determine the rate increase. This information is used to populate the user-friendly plan profile on HealthCare.gov .
> CCIIO is also making the data in this form available on the CCIIO website for public use.

> **Part II, Written Explanation of the Rate Increase:** A simple and brief narrative describing the data provided in Part I and the assumptions used to develop the rate increase, including an explanation of the most significant factors causing the rate increase. This information is posted on HealthCare.gov .

> **Part III, Rate Filing Documentation:** Rate filing documentation that CMS uses to determine whether the rate increase is unreasonable. This section of the Preliminary Justification is only required to be filed when CMS is conducting the rate review.  It is posted on the CCIIO website.

This page contains links to the rate review data posted on the CCIIO website.  Please email ratereview@hhs.gov with questions regarding the rate review information that is posted on this website or to submit comments on proposed increases.

### Data

- Search tool for Part III Rate Filing Information
  This page contains a search tool to find Part III Preliminary Justification Documentation by State and Issuer.

- Public Use File (PUF) of Preliminary Justification Part I Submissions
  The public use file includes the rate review records displayed on HealthCare.gov.  Each record contains information found in Part I of the Preliminary Justification as well as other data fields displayed on HealthCare.gov such as the review status and issuer/product IDs.  The zip file provides the Part I data in .csv and .xls formats as well a PUF documentation file that explains the variables included in the dataset. These files will be updated periodically.

  ○ Parts I and II Data as of April 2014 [ZIP, 1MB]

    A federal government website managed by the Centers for Medicare & Medicaid Services
7500 Security Boulevard, Baltimore, MD 21244



# Exhibit 2

Case: 4:14-cv-01682-JCH　Doc. #: 1　Filed: 09/30/14　Page: 11 of 23 PageID #: 11



CCIIO Home  >  Data Resources  >  Rate Review Data

## The Center for Consumer Information & Insurance Oversight

## Rate Review Data

### Background

As of September 1, 2011, the Affordable Care Act and rate review regulation require review of rate increases of 10 percent or more.  A non-grandfathered health plan sold in the individual or small group market that increases its rates by 10 percent or more is subject to review to determine whether the increase is unreasonable. Most states and territories have an underlined effective rate review program  and will review rate increases submitted by health insurance issuers in their states and territories.  CMS will review rate increases in the market(s) where states do not have an effective rate review program. Additionally, effective January 1, 2014, all plans compliant with the rate monitoring and single risk pool requirements of the Affordable Care Act are required to submit all plans within the single risk pool.

For individual and small employer plans not subject to the single risk pool, each rate increase subject to review, a health insurance issuer must submit a Preliminary Justification for each product affected by the increase.  This Preliminary Justification consists of the following parts:

**Part I, Rate Increase Summary:** A form that summarizes the data used to determine the rate increase. CCIIO is also making the data in this form available on the CCIIO website for public use.

**Part II, Written Explanation of the Rate Increase:** A simple and brief narrative describing the data provided in Part I and the assumptions used to develop the rate increase, including an explanation of the most significant factors causing the rate increase.

**Part III, Rate Filing Documentation:** Rate filing documentation that CMS uses to determine whether the rate increase is unreasonable. This section of the Preliminary Justification is only required to be filed when CMS is conducting the rate review.  It is posted on the CCIIO website.

For individual and small employer plans compliant with the single risk pool a health insurance issuer must submit a Preliminary Justification for each plan in the single risk pool. This Preliminary Justification consists of the following parts:

**Part I, Uniform Rate Review Template:** A form that summarizes the data used to determine rate increases for the entire single risk pool. CCIIO is also making the data in this form available on the CCIIO website for public use.

**Part II, Written Explanation of the Rate Increase:** A simple and brief narrative describing the data provided in Part I for any product(s) within the single risk pool which have rate increases subject to review, and the assumptions used to develop the rate increase, including an explanation of the most significant factors causing the rate increase.

**Part III, Actuarial Memorandum:** Rate filing documentation that states and CMS use to understand the actuarial assumptions, justifications and methodologies used to comply with the market rating rules and to complete the Part I template.

This page contains links to the rate review data posted on the CCIIO website.  Please email ratereview@hhs.gov with questions regarding the rate review information that is posted on this website or to submit comments on proposed increases.

### Data

- Search tool for Part III Rate Filing Information
  This page contains a search tool to find non-single risk pool compliant Part III Preliminary Justification Documentation by State and Issuer.

- Public Use File (PUF) of non-single risk pool compliant Preliminary Justification Part I Submissions
  The public use file includes the rate review records displayed on HealthCare.gov.  Each record contains information found in Part I of the Preliminary Justification as well as other data fields displayed on HealthCare.gov such as the review status and issuer/product IDs.  The zip file provides the Part I data in .csv and .xls formats as well a PUF documentation file that explains the variables included in the dataset. These files will be updated periodically.

Case: 4:14-cv-01682-JCH   Doc. #: 1 - Filed: 09/30/14   Page: 12 of 23 PageID #: 12

○ Parts I and II Data as of April 2014 [ZIP, 1MB]

- Public Use File (PUF) of single risk pool compliant Preliminary Justification Part I Submissions
  The public use file includes the entire single risk pool filing containing information found in Part I of the Preliminary
  Justification as well as other data fields such as the review status and issuer/product IDs. The zip file provides the
  Part I and II data in .csv format. These files will be updated annually

  ○ Parts I and II Data for 2014 Annual Single Risk Pool Filings as of August 2014 [ZIP, 27MB]



A federal government website managed by the Centers for Medicare & Medicaid Services
7500 Security Boulevard, Baltimore, MD 21244



# Exhibit 3



## Programs and Initiatives

Consumer Support and Information

Health Insurance Market Reforms

Health Insurance Marketplaces

Insurance Programs

Other Insurance Protections

Premium Stabilization Programs

## Resources

About Us

Data Resources

Fact Sheets and FAQs

Forms, Reports, and Other Resources

Funding Opportunities

Letters

Regulations and Guidance

Stakeholder Engagement

Training Resources

# Rate Filing Documentation (Part III)

The search tool below displays the Part III Preliminary Justification Documentation by State and Issuer. Note that the information displayed in this tool does not include Parts I and II of the issuer's Preliminary Justification Documentation for the proposed rate increase. To view this information and to submit public comment on the proposed increase, please visit **HealthCare.gov**.

Health insurance issuers are permitted to redact from their Part III public filing trade secrets and any other commercial or financial information that is privileged or confidential as defined in CMS' Freedom of Information Act (FOIA) regulations, 45 CFR 5.65. (CCIIO will review these redactions for consistency with FOIA.)

Persons using assistive technology may not be able to fully access information displayed in this tool. For assistance, please email: **ratereview@hhs.gov**.

## Step 1 – State Selection

*Please use the following list to select one to five states and/or territories. You must select at least one state and/or territory, but no more than five.*

*Note: You may select one or more state(s) and/or territories by holding the CTRL key and selecting with the mouse.*

**State and Territories:**



Alaska
Alabama
Arizona
Florida
Idaho
Louisiana
Missouri

[ Search ]

# Exhibit 4



U.S. Department of Health and Human Services
# Rate Review Annual Report
September 2014

# U.S. Department of Health and Human Services
# Rate Review Annual Report for Calendar Year 2013

## September 2014

**Background**

Since its enactment in March 2010, the Affordable Care Act has resulted in the implementation of several critical protections for consumers who purchase health insurance coverage in the individual and small group markets. These protections have brought new levels of transparency and scrutiny to health insurance rates in the individual and small group markets.  They include the Rate Review Program, the Rate Review Grant Program, the Medical Loss Ratio (MLR) requirement (also known as the "80/20 rule"), and provisions banning increased rates based on factors like pre-existing conditions or just being a woman.  The Rate Review Program requires issuers to submit for review by HHS and/or the relevant state any proposed rate increase of 10 percent or more and to justify that increase.  Through the Rate Review Grant Program, the Department of Health and Human Services (HHS) is providing $250 million in grants to states over 5 years to improve their rate review capabilities.  The MLR provision requires insurance companies in the individual and small group markets to spend at least 80% of their collected premiums on claims payments and quality improvement activities or make rebates to consumers. The statutory provision addressing rating factors (section 2701 of the Public Health Service Act) prohibits the use of health status and gender as factors to set rates, and limits permissible rating factors to geographic location, single vs. family coverage, age (within a 3 to 1 band), and tobacco use (within a 1.5 to 1 band).

These provisions of the Affordable Care Act took effect at different times.  The Rate Review Program began in September 2011.  The Rate Review Grant Program runs for five years beginning in FY2010; the MLR requirements were effective beginning calendar year 2011; and section 2701 of the Public Health Service Act, as added by the Affordable Care Act, took effect January 1, 2014.

**Rate Review Annual Reports:**  This is the third Rate Review Annual Report issued by HHS.[1]  It is based on data for calendar year (CY) 2013 submitted by states receiving rate review grants ("grantee states"), supplemented by data that are available on these states' websites, and state website data for several non-grantee states.  This report uses an analysis of data from 40 states in the individual market and 37 states in the small group market to estimate the impact of the Rate Review Program and the Rate Review Grant Program on premiums in the individual and small group markets. It focuses on the impact of these two provisions to assess trends in rate increases in the individual and small group markets.  In addition the report uses data from the MLR Program to estimate consumer savings resulting from these provisions of the Affordable Care Act.

---

[1] The first Annual Rate Review Report can be accessed  at http://www.cms.gov/CCIIO/Resources/Forms-Reports-and-Other-Resources/rate-review09112012a.html; and the second Annual Rate Review Report can be accessed at http://aspe.hhs.gov/health/reports/2013/acaannualreport/ratereview_rpt.pdf.

Beginning in September 2011, and continuing through April 2013, the Rate Review Program required insurance companies to document, submit for review, and publicly justify rate increases of 10 percent or more.  Currently, HHS collects data on all rate increases, even those below 10 percent.[2]  The Rate Review Grant Program, which is separate from the Rate Review Program, enhances state efforts to review proposed increases in health insurance rates and makes information and decisions about rate increases available to the public.  Under this grant program, the Secretary of Health and Human Services is authorized to award grants to states for the purpose of improving their review of proposed rates in the individual and small group health insurance markets.[3]  The law appropriated $250 million for rate review grants for a five year period comprising fiscal years 2010 through 2014.  Each state receiving a grant is required to submit data to HHS documenting all rate increases requested by issuers for major medical policies in both the individual and small group health insurance markets of that state.[4]

**2013 Findings**

**Key Findings:**

- **Rate review reduced total premiums by an estimated $290 million in the individual market for all states.**

- **In the individual market, the average requested rate increase was reduced by 8 percent for the 40 states examined.**

- **Rate review reduced total premiums by an estimated $703 million in the small group market for all states.**

- **In the small group market, the average requested rate increase was reduced by 11 percent for the 37 states examined.**

---

[2] Prior to the implementation of a rate increase, issuers must now submit to CMS a Rate Filing Justification for all rate increases that are filed on or after April 1, 2013, or that are effective on or after January 1, 2014 (45 CFR part 154.220 accessed at http://www.gpo.gov/fdsys/pkg/FR-2013-02-27/pdf/2013-04335.pdf) . This requirement is mandated by § 2794(a) of the Public Health Service Act, as added by § 1003 of the Patient Protection and Affordable Care Act, 42 U.S.C. § 18001 (2010).

[3] § 2794(c) of the Public Health Service Act, as added by § 1003 of the Patient Protection and Affordable Care Act, 42 U.S.C. § 18001 (2010).

[4] The Rate Review Grant Program awarded a total of $51 million to 45 states, 5 territories, and the District of Columbia in the first cycle of funding.  Through the second cycle of funding, an additional $119 million was awarded to 30 states, three territories, and the District of Columbia. The third cycle of funding awarded $67 million to 20 states for rate review, data centers, and all payer claims databases.  Details on state rate review grants can be accessed at:  http://www.cms.gov/CCIIO/Resources/Rate-Review-Grants/index.html.

- **For both markets, the total estimated reduction in premiums for 2013 was approximately $1 billion ($993 million).**

- **Together with the 2013 MLR rebates of $250 million for the individual and small group markets, this estimated reduction in premiums amounts to $1.2 billion of savings to consumers in 2013 due to the Affordable Care Act's rate review and MLR provisions.**

- **In 2012 the Affordable Care Act's MLR and rate review provisions accounted for $1.6 billion in rebates and premium reductions.   The combined amount of rebates and reduction in premium amounts for 2013 and 2012 was $2.8 billion.[5]**

*Individual Market*

**Estimated Reduction in Premiums:**  For these 40 states in 2013, 23.7 percent of total covered lives were in policies that had rate change requests reduced or denied.  We used this percentage to make an estimate for all 50 states and the District of Columbia by applying it to 2013 Medical Loss Ratio (MLR) data for covered lives in the individual market in all 51 jurisdictions. The MLR data for the individual market in 2013 shows 10.9 million covered lives and total premiums of $32.3 billion. An estimated 2.6 million covered lives (or 23.7 percent of the nationwide total), had rate change requests reduced or denied.  Based on 2013 MLR data for total individual market premiums in all states, rate review caused total premiums in the individual market to be reduced by approximately $290 million.  We calculated this estimated 8 percent reduction by multiplying the difference between the average rate increase initially requested (11.2 percent) and the average rate increase implemented (10.3 percent) in those 40 states by the nationwide total 2013 premiums of $32.3 billion.[6]

**Requested Rate Increases of 10 Percent or More:**  One quarter (25 percent) of rate filings in the individual market in 2013 contained requested rate increases of 10 percent or more and 23.1 percent of rate filings contained implemented rate increases of 10 percent or more.  Rate increases of 10 percent or more affected a larger share of covered lives in the individual market

---

[5] It is not possible to give cumulative totals  from all 3 rate review reports (2012 report, 2013 report, and this 2014 report) because both the 2012 and the 2013 report used data from CY 2012. The 2012 data reported in the 2012 report were not complete and were updated in the 2013 report.

[6] Premium and covered lives data are based on the 2013 Medical Loss Ratio (MLR) data submitted by issuers to CCIIO (available at http://www.cms.gov/CCIIO/Resources/Data-Resources/mlr.html) for all 50 states and the District of Columbia, whereas the average rate increase is based on ASPE's analysis of 40 states using Rate Review Grants (RRG) Program data and/or state website data for 38 grantee states and state website data for two non-grantee states (Florida and Oklahoma). RRG Program data was supplemented by state website data whenever such data was publicly available. Ten grantee states that submitted limited RRG Program data for 2013 were not included in the analysis. Taking the average difference between rate changes requested and rate changes implemented, weighted by the number of covered lives, and multiplied by the estimated total U.S. premiums, this report extrapolates an estimated total reduction in premiums in the individual market resulting from rate review, assuming that states without available data are similar to states that reported data.

than in the small group market.  In the individual market, 42 percent of covered lives had an average requested rate increase of 10 percent or more and 41 percent had an implemented rate increase of 10 percent or more.  Table 1 summarizes the results for the individual health insurance market.

**Table 1: Rate Change Requested Versus Rate Change Implemented in the Individual Market (Based on Analysis of 40 States)**

| Individual Market Rate Change, 2013 | Requested | Implemented[7] |
|---|---|---|
| Number of rate filings in 40 states | 647 | 647 |
| Filings with rate change requested≥ 10% for 40 states (%) | 25.0% | 23.1% |
| **Average rate change:** | | |
|    For 40 states | 11.2% | 10.3% |
|    When request ≥10% for 40 states | 18.4% | 16.9% |
| **Covered Lives:** | | |
|    Number of covered lives affected by these rate filings | 6,918,000 | 6,918,000 |
|    Covered lives with rate change requested≥10% for 40 states (%) | 42.0% | 41.0% |
|    Covered lives with rate change request reduced or denied (%) | | 23.7% |
|    Total covered lives with rate request change reduced or denied based on 10.9 million total covered lives for all states | | 2.6 million |
| Total U.S. estimated reduction in premiums  based on $32.3 billion total premiums in the individual market for all states | | **$290 million** |
| *Sources:  Revised State Rate Review Grant (RRG) data and data from state websites[8]* | | |

*Small Group Market*

**Estimated Reduction in Premiums:**  For these 37 states, 20.5 percent of total covered lives were in policies that had rate change requests reduced or denied.  We used this percentage to make an estimate for all 50 states and the District of Columbia by applying it to 2013 MLR data

---

[7] Rate Change Implemented includes modifications (increases and decreases) and denials.

[8] The individual market data are based on MLR data from 50 states and the District of Columbia (accessed at http://www.cms.gov/CCIIO/Resources/Data-Resources/mlr.html), whereas the average difference between rate changes requested and rate changes implemented is taken from ASPE's analysis of 40 states using Rate Review Grants (RRG) Program data and/or state website data for 38 grantee states and state website data for two non-grantee states (Florida and Oklahoma).  The results were extrapolated to approximate a national total premium reduction for the individual market as a result of rate review. See footnote 7 for more detail.

for covered lives in the small group market in all 51 jurisdictions. The MLR data for the 2013 small group market shows 17.3 million covered lives and $78.2 total premiums.  Of the 17.3 million covered lives in the small group market nationwide, 20.5 percent, or an estimated 3.6 million covered lives, had rate change requests reduced or denied.  Based on 2013 MLR data for total small group market premiums in all states, rate review resulted in a reduction in total premiums of approximately $703 million.  We calculated this estimated 11 percent reduction by multiplying the difference between the rate increase initially requested (8.0 percent) and the rate increase implemented (7.1 percent) by the total 2013 premiums of $78.2 billion. [9]

**Requested Rate Increases of 10 Percent or More:**  Compared to the individual market, a smaller share of small group rate filings requested rate increases of 10 percent or more in 2013 (20.7 percent of small group rate filings compared to 25 percent of individual market rate filings).  Overall, 18.1 percent of small group rate filings and 23.3 percent of small group covered lives experienced an implemented rate increase of 10 percent or more.  Approximately one-fifth (20.5 percent) of total covered lives in small group policies had a rate change request reduced or denied through rate review in the small group market.  Table 2 summarizes the results for the small group insurance market.

---

[9] This estimate uses information submitted by 36 states through the Rate Review Grant Program and/or grantee state websites, plus state website data from Florida, a non-grantee state, and is based on the average difference between rate changes requested and rate changes implemented, weighted by the number of covered lives. RRG Program data were supplemented by state website data whenever such data was publicly available.  Eight states submitted limited RRG Program data in the small group market and were therefore not included in the analysis. As with the individual market analysis, the small group estimates includes data from the reporting states on all rate increases, even those below 10 percent, in the small group market and assumes that the difference will be similar in the states that did not report data.

5

**Table 2: Rate Change Requested Versus Rate Change Implemented in the Small Group Market (Based on Analysis of 37 States)**

| Small Group Market Rate Change, 2013 | Requested | Implemented[10] |
|---|---|---|
| Number of rate filings in 37 states | 1,099 | 1,099 |
| Filings with rate change requested ≥10% for 37 states (%) | 20.7% | 18.1% |
| **Average rate change:** | | |
|     For 37 states | 8.0% | 7.1% |
|     When request ≥10% for 37 states | 14.4% | 11.6% |
| **Covered Lives:** | | |
|     Number of covered lives affected by these rate filings | 10,424,000 | 10,424,000 |
|     Covered lives with rate change requested≥10% for 37 states (%) | 29.7% | 23.3% |
|     Covered lives with rate change request reduced or denied (%) | | 20.5% |
|     Total covered lives with rate request change reduced or denied based on 17.3 million total covered lives in the small group market for all states | | 3.6 million |
| Total U.S. estimated reduction in premiums  based on $78.2 billion total premiums in the small group market for all states | | **$703 million** |
| *Sources:  Revised State Rate Review Grant (RRG) data and data from state websites[11]* | | |

## ACA Insurance Reforms and Rate Trends in the Individual and Small Group Markets

### *Individual Market Trends*

Before the enactment of the Affordable Care Act, annual premium increases were highly variable and increases averaged 10 percent or more at the state-level.  From 2008 to 2010, the average annual rates of premium increases in the individual market ranged from 9.9 percent to 11.7 percent.  In 2010, many increases were in the range of 9 to 15 percent, but a full quarter of issuers increased premiums by 15 percent or more. The average annual state-level increase was 10 percent or higher.[12]

---

[10] Rate Change Implemented includes modifications (increases and decreases) and denials.

[11] As with the individual market data, the small group premium data are based on MLR data from 50 states and the District of Columbia (accessed at http://www.cms.gov/CCIIO/Resources/Data-Resources/mlr.html), whereas the average difference between rate changes requested and rate changes implemented is taken from ASPE's analysis of 37 states in the small group market using Rate Review Grant Program data and/or state website data for 36 grantee states and data from Florida, a non-grantee state.  Again, the results were extrapolated to estimate a total national reduction in premiums for the small group market as a result of rate review.

[12] To gather baseline premium information, ASPE commissioned NORC, at the University of Chicago, to collect data from a sample of state insurance departments for the period 2008-2011 (the number of states grows from 16 to 21 states over those years) (accessed at http://www.aspe.hhs.gov/health/reports/2014/Premiums/20121119%20PremTrendsRptFnl.pdf). In addition, ASPE analyzed available data from individual market rate filings submitted for 2012 (39 states) and 2013 (40 states) from

After the enactment of the Affordable Care Act in 2010, average rate increases moderated to 7.0 percent in 2011 and 7.1 percent in 2012.  The average rate increase was 10.3 percent in 2013, but would have been 8.7 percent if the high increases in one state, California, were excluded.

***Small Group Market Trends***
In the period immediately preceding the Affordable Care Act (2008-2010), the average annual rates of increase in premiums in the small group market were 11.2 percent in 2008 and 2009, and 8.8 percent in 2010, with substantial variability by state.  After the law's enactment, the average annual rates of increase declined to 6.1 percent in 2011 and 4.7 percent in 2012.  In 2013, the average rate of increase was 7.1 percent.

**Conclusion**

The rate review provisions of the Affordable Care Act enhance transparency in the health insurance market and hold insurance companies accountable for rate increases.  Rate changes are now public information, and issuers must provide data on requested increases of any size.  While the average premium increased more in 2013 than in prior years, it was still less than typical growth prior to the Affordable Care Act.  Consumers nevertheless benefited from an estimated reduction in premiums of nearly $1.0 billion ($290 million in the individual market and $703 million in the small group market).  When added to the $250 million in MLR rebates that consumers received for CY 2013, the Affordable Care Act's rate review and MLR provisions have, together, accounted for approximately $1.2 billion in premium reductions and rebates for consumers.  In 2012 the total combined effect of these two provisions was $1.6 billion. For 2012 and 2013 the total combined effect of these two provisions was $2.8 billion.

For rate filings for plan years 2014 and later, issuers must submit data for all of the plans in their risk pools in a single rate filing to both their state and CMS.[13]  This data will substantially improve the ability to review rate impacts on the market as a whole, compare rates across issuers, and monitor changes over time.  Using both historic and new filing and review methods, HHS will continue to monitor the long-term trend of requested and implemented rate increases in the health insurance market.

---

rate grant states, publicly available state data, and data from several non-grantee states. ACA rate review grants significantly increased the number of states posting their rate filings on websites, making data collection easier. However, these data should be used with caution because there was no national source of comparable data, plans varied in what services were covered, applicants could be medically underwritten in most states, and the available data has significant limitations and omissions.

[13] An issuer must submit data to HHS if the issuer has a rate increase of any size for any plan; if the issuer has a Qualified Health Plan in its single risk pool; or if the state Department of Insurance requires the issuer to submit the federal template when submitting rate filings.  Although a tiny fraction of issuers may not meet any of these requirements, the vast majority of issuers will meet one or more of these requirements and therefore be required to submit data to HHS.